## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| **GABRIEL KAKNES,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 24-cv-11709-DJC** |
| ) | |
| **FRANK BISIGNANO,** ) | |
| **COMMISSIONER OF** ) | |
| **SOCIAL SECURITY ADMINISTRATION,[1]** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

### MEMORANDUM AND ORDER

**CASPER, J.**                                                    **August 13, 2025**

## I.    Introduction

Plaintiff Gabriel Kaknes ("Kaknes") filed a claim for disability insurance benefits ("SSDI") with the Social Security Administration ("SSA"). Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Kaknes brings this action for judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on August 2, 2023, denying his claim. Before the Court are Kaknes's motion to reverse, D. 13, and the Commissioner's motion to affirm the decision, D. 19. For the reasons discussed below, the Court DENIES Kaknes's motion, D. 13, and ALLOWS the Commissioner's motion, D. 19.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Court substitutes the current Commissioner of the Social Security Administration.

II.    **Legal Standard**

A.  <u>Entitlement to Disability Benefits and Supplemental Security Income</u>

A claimant's entitlement to SSDI turns on whether he has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The inability must be severe, rendering the claimant unable to do his previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.  20 C.F.R. § 416.920(a).  All five steps are not applied to every applicant; the determination may be concluded at any step along the process.  <u>Id.</u> § 416.920(a)(4).  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  <u>Id.</u> § 416.920(a)(4)(i).  Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.  <u>Id.</u> § 416.920(a)(4)(ii).  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.  <u>Id.</u> § 416.920(a)(4)(iii).  Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he can still perform past relevant work, then the application is denied.  <u>Id.</u> § 416.920(a)(4)(iv). Fifth and finally, if the applicant, given his RFC, education, work experience, and age, is unable to do any other work, then the application is granted.  <u>Id.</u> § 416.920(a)(4)(v).

B. <u>**Standard of Review**</u>

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999). Issues of credibility and inferences drawn from the facts on record are committed to the Commissioner who resolves conflicts in the evidence and determines the disability status of the claimant. <u>Lizotte v. Sec'y of Health and Hum. Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." <u>Rodriguez v. Sec'y of Health and Hum. Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981), As such, the Court must affirm the Commissioner's decision if it is supported by substantial evidence "even if the record arguably could justify a different conclusion." <u>Pagan v. Sec'y of Health and Hum. Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987). The district court reviews questions of law *de novo*. <u>Seavey v. Barnhart</u>, 276 F.3d 1, 9 (1st Cir. 2001).

III.    **Factual Background**

Kaknes was thirty-one years old when he ceased working on August 25, 2020 due to his physical and mental conditions. R. 70, 243.[2] He has a bachelor's degree in biology and had previously worked as an office clerk, theater ticket taker, chemical lab and pharmaceutical lab technician, ice cream server and cashier. R. 28, 62-63, 244-45.

---

[2] Citations to the administrative record, D. 8, in this case shall be to "R. [page number]."

### A. **Procedural History**

Kaknes initially filed a claim for SSDI with the SSA on April 26, 2021, asserting that he was unable to work as of August 25, 2020. See R. 70, 225-28, 243. He alleged impairments including bipolar II disorder, post traumatic stress disorder ("PTSD"), fibromyalgia, chronic pain, tremors, bilateral gastrocnemius contracture and Achilles tendon contracture. R. 70, 243. After initial review, the SSA denied the application on August 6, 2021. R. 117-18. On August 12, 2021, Kaknes requested reconsideration of the initial denial. R. 121. His claims were reviewed again and denied on March 29, 2022. R. 123-24. On April 8, 2022, Kaknes filed a timely request for a hearing before an ALJ. R. 127-28. A hearing was held before the ALJ on January 24, 2023. R. 22-69. In a written decision dated August 2, 2023, the ALJ determined that Kaknes did not have a disability within the definition of the Social Security Act and denied his claims. R. 91-108. The SSA's Appeals Council denied Kaknes's request for review on May 9, 2024, rendering the ALJ's decision the final decision of the Commissioner. See R. 1-5.

Kaknes filed this action against the Commissioner on July 2, 2024, D. 1, and now moves this Court for an order reversing the Commissioner's final decision, D. 13. The Commissioner has moved for an order affirming same. D. 19.

### B. **Before the ALJ**

The record before the ALJ included the following: (1) testimony at the ALJ hearing; (2) Kaknes's medical records, including a functional report completed by Kaknes and medical assessments by Kaknes's providers; and (3) state agency expert assessments of Kaknes's RFC.

    *1. Testimony at ALJ Hearing*

      a) <u>Kaknes's Testimony</u>

Kaknes testified before the ALJ hearing on January 24, 2023.  R. 22, 27-61.  He discussed his education and prior work history.  R. 28, 34-41, 48.  Kaknes testified that he had "radiating pain" in his spine and that when using a computer, he "can only use the mouse, because [his] left arm has radiating pain from [his] spine."  R. 46, 49.  Kaknes also testified that he had fibromyalgia, cervicalgia, neurological tremors and arthritis in his right foot.  <u>Id.</u>  Kaknes attested that his fibromyalgia causes pain and his tremors "make[] it difficult to write on [sic] a computer for long periods of time."  R. 49.  Upon examination by his attorney, Kaknes testified that he has a lifting restriction of approximately "no more than eight pounds," and he was currently seeing a neurologist for his migraines and tremors.  R. 51, 57.

      b) <u>Vocational Expert's Testimony</u>

The ALJ heard the testimony of vocational expert, Fran Plaisted ("Plaisted").  R. 61-68. Plaisted testified about the skill level and level of exertion required by Kaknes's prior work as an office clerk, theater ticket taker, chemical lab and pharmaceutical lab technician, ice cream server and cashier.  R. 62-63.  The ALJ then asked a series of hypotheticals to discern whether an individual with a RFC comparable to Kaknes's RFC could perform Kaknes's past work and whether there would be other jobs in the national economy that could be performed by such a hypothetical individual.  R. 62-66.  First, the ALJ asked Plaisted to assume an individual that:

> would be able to lift and/or carry twenty pounds occasionally and ten pounds on a frequent basis; would be able to stand and/or walk for six hours in an eight-hour workday over a forty-hour workweek.  This person would be able to sit for six hours in an eight-hour workday over a forty-hour workweek.  And this person would occasionally be able to climb stairs and ramps, but never ropes, ladders, or scaffolds; would occasionally . . . be able to handle with the bilateral upper extremities.  This person would occasionally be able to balance, stoop, crouch, kneel, and crawl.  This person would have to avoid concentrated exposure to

unprotected heights and moving dangerous machinery; however, could operate a motor vehicle. This person would have to avoid concentrated exposure to extremes in temperature, humidity, vibration, and vibratory tools, loud noise such as would be encountered at a construction site, and pulmonary irritants. This person would be able to understand and carry out instructions for simple, routine tasks and maintain concentration, persistence, and pace in the performance of these tasks for two-hour increments over an eight-hour workday, during a forty-hour workweek. This person would be able to relate to co-workers, supervisors, and the public on superficial interaction basis, being defined as the exchange of work-related information or the handing off of products or materials. This person would be able to deal with only minor changes in the workplace. And this person would have to work in a location where there would be readily available toilet facilities.

R. 63-64. Plaisted testified that based on the ALJ's first hypothetical, an individual would not be able to perform Kaknes's past work or any other work. R. 64. When the ALJ modified the hypothetical from "occasionally . . . be able to handle with bilateral upper extremities" to "limited to frequently handling with the bilateral upper extremities," Plaisted testified that an individual with those limitations could work as a copy machine operator, collator operator and laundry worker. R. 64-65. When the ALJ modified the hypothetical, again, by adding the limitation that the person "would be off task for 15% of a normal workday on a regular and sustained basis," Plaisted testified that such limitations would preclude such individual from employment. R. 65-66. When the ALJ modified the hypothetical, by adding the limitation of "had to absent from work once every month on a regular, sustained basis," Plaisted testified that such limitations also would preclude an individual from employment. Id. When the ALJ modified the hypothetical, once more, by adding the limitation of "would be off task for 5% of a normal workday," Plaisted opined that an individual with those limitations could work as a copy machine operator, collator operator or laundry worker. R. 66. When Kaknes's attorney modified the hypothetical to "limited to [lifting] only ten pounds occasionally and ten pounds frequently" and "[must] alternate between sitting and standing after sitting for thirty minutes," Plaisted opined that such limitations would preclude an individual from employment. R. 66-67.

6

2.  *Kaknes's Medical Records*

Kaknes presented the ALJ with evidence concerning his medical history,[3] including assessments, diagnoses and treatment records.

a)  Fibromyalgia/Chronic Pain Syndrome and Cervicalgia

At an office visit on April 3, 2019, Kaknes presented with fibromyalgia, reporting "persistent significant pain [that had] somewhat improved."  R. 2302.  Through May and June 2019, Kaknes continued to report "persistent significant pain that limits functionality" but had "no gross deficits in sensation, motor coordination, or gait."  R. 2307, 2319, 2332.

On September 20, 2019, Kaknes was evaluated by Dr. Urits, who documented "5/5 strength" in each of Kaknes's extremities, "bilateral paraspinal tenderness" and "[normal] range of motion" in his neck and back.  R. 437.  Kaknes also saw PT Eberhardt for physical therapy, with records through November 2019, indicating that Kaknes "respond[ed] well to conservative treatment . . . showing significant reductions in pain as well as improved functional use of [his right arm]."  R. 665; see R. 647, 651, 655, 659, 663, 667, 671, 675, 679, 682, 685, 689, 693, 697, 701, 705, 709.  At physical therapy sessions between December 2019 and May 2020, Kaknes frequently reported increases in fibromyalgia symptoms, sometimes reporting "limitations in [his] daily work activities due to pain."  R. 629; see R. 605, 609, 612, 615, 618, 621, 624, 627, 631, 635, 639, 643.

In an appointment with Dr. Dyke on July 15, 2020, Kaknes reported he was in "horrible" pain and "hasn't had time for [physical therapy]."  R. 2516.  Dr. Dyke otherwise observed "no gross deficits in sensation, motor function, coordination, or gait" and "normal [range of motion],

---

[3] The Court focuses this summary on the medical records relating to Kaknes's physical conditions as those are the conditions pertinent to the issues raised in Kaknes's motion.  See D. 14 at 3-5, 8-11.

normal bulk and tone." R. 2519. On September 1, 2020, Kaknes reported "[w]orsening chronic pain diffusely." R. 2539. At a December 8, 2020 evaluation with Fenway Health's pain management service, Kaknes complained of neck and upper back pain, with "diffuse joint pain [in] hands, knees, feet, [and] ankles." R. 1057. At an initial consultation with neurologist Dr. Dearborn-Tomazos on December 29, 2020, Kaknes had normal motor strength of "5/5 throughout [but] [m]ild weakness (5-/5) in bilateral thumb abduction." R. 1063, 1066. His Romberg test was also negative and his gait was "[n]arrow based and steady." Id. In an appointment with Dr. Odell on January 21, 2021, Kaknes reported he "can stand for 10-20 min[utes] on a good day" and "gets upper back pain when sitting at the computer." R. 2599. At Kaknes's next visit on February 11, 2021, he continued to report back pain, which "worse[ned] with bending, lifting or just sitting [at] a computer." R. 2605. A neurologist, Dr. Boegle, performed a "focused physical examination" of Kaknes on February 12, 2021, which documented "normal muscle bulk, tone, [] reflexes in the bilateral upper extremities, [and] [w]ith best effort, strength appeared full." R. 1591. Through April 2021, Kaknes continued to report "ongoing chronic pain," R. 2644, 2656, but his muscle strength and gait remained normal, R. 1074-75, 2068.

On April 6, 2021, Kaknes presented to PT Eberhardt with "cervical/thoracic pain, . . . significant deficits in cervical [range of motion], altered posturing, and impaired muscle performance." R. 1893-94. At a follow-up visit on April 15, 2021, PT Eberhardt noted that Kaknes had "significant mobility restrictions due to [] knee pain" and "altered pain beliefs [which were] also highly contributing to high levels of disability and impairing [his] participation in self care activities." R. 1887-88.

On June 9, 2021, Kaknes reported feeling "more functional," with Dr. Mahmood noting "[c]ompounded cream with 10% ketamine has been helpful to improve pain function."

R. 2073, 2075.  Dr. Mahmood also performed a physical which was otherwise normal except for tenderness to palpitation in Kaknes's hands and back.  R. 2074-75.  At an office visit with Dr. Bettencourt on August 3, 2021, Kaknes reported discomfort in his right side, which improved with walking, stretching, and supine rest.  R. 2681.  Dr. Bettencourt's physical examination documented normal strength and active range of motion in Kaknes's muscles.  R. 2685.  On August 16, 2021, a rheumatologist, Dr. Stockton, documented Kaknes's symptoms as "positive for . . . joint pain [and] loss of function," with "[n]o muscle weakness" and a "normal" gait.  R. 1935, 1937.

In an appointment with Dr. Odell on August 17, 2021, Kaknes reported his pain makes him unable to "carry more than 10-15 pounds" or "sit for longer than an hour without standing up to move/stretch."  R. 2687.  At a follow-up appointment on December 13, 2021,  Kaknes had a normal gait and an otherwise nontender back, except for "some mild tenderness" in his right lumber area. R. 2719.

On March 24, 2022, Kaknes began physical therapy with PT Sheridan.  R. 1690.  Notes from PT Sheridan's physical evaluation document Kaknes's cervical active range of motion as limited by pain, his gait as shortened in stride and decreased in speed and his posture as "forward head with rounded shoulders."  R. 1692-93.  At the next two physical therapy visits, on March 29, 2022 and April 15, 2022, Kaknes recorded "good" progress towards his therapy goals. R. 1701-02, 1704.  Kaknes was then discharged from physical therapy on April 28, 2022, completing three out of his planned sessions.  R. 1696, 1706.

Records from office visits with PA-C Frushtick through July 2022, indicate that despite difficulty in "cop[ing] with chronic pain," Kaknes was "[o]verall healthy and doing well." R. 2964, 2969.  A physical examination conducted on July 15, 2022 was also unremarkable, finding Kaknes's neck, back, and abdomen were normal on inspection.  R. 2043.  At an

9

appointment with PA-C Frushtick on October 3, 2022, Kaknes reported he "ha[d] a pinched nerve on [his] back" and was "taking muscle relaxants without relief." R. 3037.  On November 14, 2022, Kaknes presented with elevated cervicalgia symptoms, reporting that he was "experiencing pain while turning [his] head in any direction," and was "unable to move his head up and down for consuming medications due to neck pain." R. 3025.  He also reported being unable to "sit at a computer for longer than 25 minutes," having "neck and shoulder problems lifting a carton of milk" and having to "get up and move around frequently."  Id.  An imaging report of Kaknes's cervical spine dated November 14, 2022 reflected notes indicating "[n]eck pain [was] radiating to [the] left shoulder." R. 3033.

b)  <u>Bilateral Gastrocnemius Tightness and Achilles Contracture</u>

At an office consultation dated March 10, 2021, with orthopedist Dr. Farina, Kaknes complained of foot pain "localized diffusely across bilateral ankles and mid feet." R. 1067-68.  Dr. Farina's examination documented "[f]ull 5 out of 5 strength in all planes of the foot and ankle" and a "stiff gait about the ankles." R. 1070.  Subsequently, Kaknes was diagnosed with "bilateral gastrocsoleus tightness and Achilles contracture."  Id.  A rheumatologist, Dr. Stockton, conducted an initial evaluation of Kaknes on August 16, 2021, describing Kaknes's gait as normal, but knees as "[t]ender[] with . . . flexion" and ankles as tender to palpitation. R. 1937.  Kaknes presented to DPM Thurmond on July 14, 2022, with a "[n]ormal heel-toe gait pattern bilaterally" and "mild tenderness on [range of motion]" in his right foot. R. 2945.

c)  <u>Neurological Tremors</u>

On December 8, 2020, Kaknes presented to NP Gusiora with a "mild intention tremor []" when reaching," R. 1060.  At a December 29, 2020 evaluation with a neurologist, Dr. Dearborn-Tomazos, Kaknes reported bilateral hand numbness, with a relevant medical history of dystonia in

his right arm due to a "reaction to Geodon." R. 1063-64. At this visit, Dr. Dearborn-Tomazos recommended an electromyography diagnostic study. R. 1067. On February 12, 2021, a concentric needle electromyography was performed in the muscles of Kaknes's bilateral upper extremities. R. 1082-83. The results of this study were unremarkable, reporting "[a]ll tested muscles [as] normal" and tested nerves as "normal and symmetric." R. 1083. On June 4, 2021, Kaknes was admitted to Beth Israel Deaconess Medical Center's Emergency Department for "muscle twitching and malaise after receiving [his] 2nd Moderna COVID vaccine." R. 2071; see R. 2070-72. Notes from this admission describe Kaknes's physical examination as "reassuring" and indicated no "dystonic reaction at this time." R. 2072. Kaknes was discharged the same day. Id. Records through November 2022, indicate that Kaknes's tremors were "likely benign [and] familial," R. 2682, 2689, 2706, 2741, 2760, 2944, 2959, 2964, 2975, 3026, 3038, but also occasionally document that he had "increased tremors," R. 1875, or "no tremors," R. 2685.

d) Function Report

The ALJ also considered a Function Report submitted by Kaknes, completed on June 18, 2021. R. 265-74. In this report, Kaknes indicated, among other things, that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and use his hands. R. 270. He also noted difficulties dressing and bathing, requiring a friend to help put his ankle braces on and to wash his back due to difficulty bending his arms. R. 266. Kaknes further indicated that he rarely cleans because of his pain, fatigue and frequent medical appointments. R. 267.

Kaknes also wrote that he can "only lift 5 to maybe 10 lbs regularly in a day," and does not "walk more than 1 mile at most." R. 270. He further indicated that he can generally walk four

blocks until needing to sit for ten to twenty minutes to rest but when he has a "bad pain day," he is unable to do even that.  Id.

### e)  Medical Assessment by Treating Provider, Julianne Beck, PT

Kaknes's physical therapist, Julianne Beck, PT, prepared a questionnaire evaluating Kaknes's level of physical impairment  on September 22, 2022.  R. 2809-10.  In this questionnaire, PT Beck concluded that Kaknes could not perform a medium level occupation on a full-time basis. Id.  PT Beck indicated that Kaknes's upper extremity strength is "3+/5" and Kaknes is incapable of lifting greater than ten pounds without pain.  R. 2810.  PT Beck opined that Kaknes's "hypersensitivity" of his thoracic and lumbar joints limits his endurance for sitting and standing. Id.  PT Beck further opined that Kaknes's "hypomobility" of his thoracic and lumber joints makes him incapable of "bend[ing] or stoop[ing]" and that "contractures of [his bilateral] gastrocnemius [] limits standing [and] transfer[ring]."  Id.  PT Beck otherwise opined that Kaknes could perform a sedentary level occupation on a full-time basis.  Id.

### f)  Medical Assessment by Treating Provider, Shimontini Mitra, M.D.

On December 12, 2022, treating provider Shimontini Mitra, M.D., addressed Kaknes's cervicalgia.  R. 3017, 3085.  In this progress note, Dr. Mitra concluded Kaknes was "unable to work at the moment" due to his cervicalgia.  R. 3017.  Dr. Mitra described Kaknes's cervicalgia as "severely limiting," indicating his condition makes him unable to "sit at [a] computer for longer than 25 minutes"  and causes "neck and shoulder problems [when] lifting a carton of milk to pour." R. 3017, 3085.  Dr. Mitra further indicated Kaknes's cervicalgia requires him to get up and move around frequently.  Id.

3. *State Agency Expert Assessments*

The ALJ also considered state agency expert assessments of Kaknes's functional limitations. The state agency expert assessments consisted of examiners for Kaknes's initial and application request and for his request for reconsideration. The initial expert assessment of Kaknes's limitations was conducted by Dr. Elaine Hom, who determined that Kaknes has medically determinable impairments and his impairments are expected to produce pain and other symptoms. R. 73-75. Dr. Hom determined that Kaknes could occasionally lift or carry up to 20 pounds, could frequently lift or carry up to 10 pounds, could sit for six hours in an eight-hour day and could stand and/or walk for four hours in an eight-hour day. R. 73-74. Dr. Hom further determined that Kaknes could occasionally climb ramps, stairs, ladders, ropes, or scaffolds and that he could also occasionally stoop, kneel, crouch and crawl. R. 74. As for manipulative limitations, Dr. Hom determined Kaknes was limited to handling frequently. Id. Based on the limitations opined by Dr. Hom, a disability examiner, Josephine McKenzie, determined that Kaknes had a "maximum sustained work capability" for sedentary work. R. 77-78. The second expert assessment, conducted by Dr. Wayne Draper was consistent with many of Dr. Hom's conclusions regarding physical limitations, but determined that Kaknes could never climb ladders, ropes, scaffolds, that Kaknes has no manipulative limitations and that Kaknes could stand for six hours in an eight-hour day. R. 83-85.

**C.  ALJ's Decision**

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ concluded that Kaknes had not engaged in substantial gainful activity since the alleged onset date, August 25, 2020. R. 97. At step two, the ALJ found that Kaknes had the following severe impairments: fibromyalgia, depressive disorder, migraine headaches, anxiety disorder, PTSD and mild weakness

with bilateral thumb abduction.  Id.  At step three, the ALJ concluded that Kaknes did not have an impairment, or combination of impairments, which met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 98-99.

The ALJ next determined that Kaknes's RFC allowed him to perform light work as defined in 20 C.F.R. § 404.1567(b), except he can lift and/or carry twenty pounds occasionally and ten pounds frequently; can stand and/or walk for six hours in an eight hour workday over a forty hour workweek; can sit for six hours in an eight hour workday over a forty hour workweek; can occasionally climb stairs and ramps but never ropes, ladders or scaffolds; can frequently handle with bilateral upper extremities; occasionally balance, occasionally stoop, crouch, kneel and crawl; must avoid concentrated exposure to unprotected heights and moving and dangerous machinery; however, could operate a motor vehicle; would have to avoid concentrated exposure to extremes in temperature, humidity, vibration and vibratory tools, loud noise such as would be encountered at a construction site and pulmonary irritants; would be able to understand and carry out instructions for simple routine tasks and maintain concentration persistence and pace in the performance of these tasks for two hour increments over an eight hour workday, during a forty hour workweek; would be able to relate to co-workers, supervisors and the public on a superficial interactional basis, being defined as the exchange of work-related information or the handing off of products or materials; would be able to deal with only minor changes in the work place; would need a workplace with readily available toilet facilities; and would be off task five percent of a normal workday on a regular and sustained basis.  R. 99-100; see R. 100-105.  Kaknes disputes the ALJ's determination regarding his RFC.  D. 14 at 6-12.

At step four, the ALJ concluded that, at his RFC, Kaknes was unable to perform any past relevant work.  R. 106-07.  At step five, the ALJ determined that considering Kaknes's age,

education, work experience and RFC, there are jobs that exist in significant numbers in the national

economy that Kaknes can perform.  R. 107.  Accordingly, the ALJ concluded that Kaknes was not

disabled.  R. 108.

## IV.    Discussion

### A.    Kaknes's Challenges to the ALJ's Findings

Kaknes contends that the ALJ erred by (1) failing to articulate his analysis of the medical

opinion evidence according to the governing regulations, D. 14 at 6-12 and (2) mischaracterizing

the record by ignoring evidence which opposed his view, id. at 9-12.

#### 1.    The ALJ's Articulation of his Analysis of Medical Opinion Evidence

An ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of

the prior administrative medical findings in [the] case record."  20 C.F.R. § 404.1520c(b).  To

satisfy this articulation requirement, the ALJ must explain how he "considered the supportability

and consistency factors for a medical source's medical opinions."  Id. § 404.1520c(b)(2).  With

respect to the supportability factor, the ALJ is required to evaluate medical opinions according to

the standard that "[t]he more relevant the objective medical evidence and supporting explanations

presented by a medical source are to support his or her medical opinion(s) or prior administrative

medical finding(s), the more persuasive the medical opinions or prior administrative medical

finding(s) will be."  Id. §§ 404.1520c(c)(1), 416.920c(c)(1).  As to the consistency factor, the ALJ

is required to examine whether a medical opinion is consistent with the record as a whole.  Id. §§

404.1520c(c)(2), 416.920c(c)(2).

The ALJ concluded that opinions of treating providers PT Beck and Dr. Mitra were "not

persuasive," R. 104-05, and that opinions of state agency experts Dr. Hom and Dr. Draper were

"largely persuasive," R. 105.  The ALJ also concluded that Dr. Hom's opinion as to Kaknes's

standing/walking limitations was "not persuasive" and Dr. Draper's opinion as to Kaknes's manipulative abilities was "not persuasive." Id.

Kaknes contends that the ALJ did not "properly evaluate and articulate his evaluation" of the opinions of PT Beck, Dr. Mitra and Dr. Hom. D. 14 at 12. Specifically, Kaknes contends the ALJ failed to comply with governing regulations by not articulating his evaluation of supportability and consistency factors for these opinions. See id. at 7-12.

a)    The ALJ's evaluation of the opinion of Julianne Beck, PT

PT Beck opined that Kaknes had a lifting restriction of ten pounds, could not bend or stoop and had less endurance for holding sitting/standing positions. R. 2809-10. The ALJ, in concluding PT Beck's opinion was "not persuasive," described these limitations as "not supported by objective findings and inconsistent with the treatment record." R. 104. Specifically, the ALJ noted PT Beck's opinion was unpersuasive because Kaknes "retains full motor strength throughout with little evidence of objective abnormalities that would support a lifting restriction to 10 pounds" and while "[he] may have some level of hypersensitivity of the lumbar and thoracic joints, [] physical exams consistently show few resulting functional deficits." Id. Kaknes disputes this conclusion, arguing PT Beck provided a "supportive explanation that the regulations indicate 'will' render an opinion 'more persuasive,'" D. 14 at 8, and the ALJ failed to "explain his contrary conclusory assertion," id. at 10.

As to supportability, Kaknes argues that PT Beck supported her opinion by referencing medical findings of hypomobility and sensitivity. Id. at 8. With respect to the relevance of these findings, Kaknes contends the ALJ "substitute[d] his own laymen's opinion," by citing evidence of strength or ambulation, not hypomobility and sensitivity, which are more relevant to endurance for standing/sitting. Id. at 8-9. Although it is true that an ALJ is not permitted to substitute his

own opinion for that of a medical provider, <u>Scott v. Saul</u>, No. 19-cv-12552-LTS, 2021 WL 735851, at *11 (D. Mass. Feb. 25, 2021), the ALJ has not done so here.  Rather, the ALJ's determination of Kaknes's RFC was based on physical limitations raised by Dr. Hom and Dr. Draper.  <u>See</u> R. 105.  The ALJ explained that Dr. Hom's opinion that Kaknes "is capable of light work with additional postural and manipulative restrictions is consistent with the longitudinal treatment record as a whole and supported by the medical findings cited within" and that Kaknes "consistently ambulates with a normal gait and exhibits full motor strength . . . with no indication of significant ambulatory or standing deficits." <u>Id.</u>  Regarding Dr. Draper's opinion that Kaknes was "capable of performing a restricted range of light work with additional postural and environmental limitations," the ALJ noted it was, like Dr. Hom's opinion, "consistent with the longitudinal treatment record a whole and supported by the medical findings therein."  <u>Id.</u>  The ALJ further articulated his analysis by acknowledging Kaknes's "subjective complaints of global hypersensitivity," and stating that despite these complaints, "physical examinations generally show full motor strength throughout with no evidence of significant ambulatory dysfunction." R. 101.  Notably, courts have not required ALJs to be "paragon[s] of clarity."  <u>Perrino v. Kijakzi</u>, No. 21-cv-11267-ADB, 2023 WL 2743370, at *8 (D. Mass. Mar. 31, 2023) (quoting <u>Andrews v. U.S. Soc. Sec. Admin.</u>, No. 16-cv-00270, 2017 WL 2670735, at *3 (D.N.H. June 20, 2017)).  The Court, therefore, concludes the ALJ adequately discussed the supportability of PT Beck's opinion.

As to consistency, Kaknes references records of several providers, arguing "PT Beck's findings are consistent with [these] medical sources."  D. 14 at 10.  Kaknes references NP Gusiora's records, indicating diffuse joint pain and a mild tremor when reaching, and Dr. Dearborn-Tomazos's records, indicating mild weakness in bilateral thumb abduction.  <u>Id.</u>  Kaknes also references Dr. Farina's records, indicating a stiff gait about the ankles, suggestive of

gastrocsoleus tightness, and PT Sheridan's records, which observed a shortened and slower gait, a posture with forward head and impaired range of motion.  Id. at 9-10.  Kaknes further references PT Eberhardt's records where "significant mobility restrictions," with spinal hypomobility were observed, and PA-C Frushtick's records, indicating extreme tenderness to light palpation in Kaknes's neck and back.  Id.

Although Kaknes points to some objective findings in the record that are consistent with PT Beck's opinion, the ALJ is not required to discuss every piece of evidence to show that it was considered.  Arrington v. Berryhill, No. 17-cv-1047, 2018 WL 818044, at *2 (1st Cir. Feb. 5, 2018).  Rather, an ALJ is "subject to only the most minimal of articulation requirements—an obligation that extends no further than grounding a decision in substantial evidence." Morales v. O'Malley, 103 F. 4th 469, 471 (7th Cir. 2024) (internal citation and quotation marks omitted); see Kyle K. v. O'Malley, No. 23-cv-00044-JAW, 2024 WL 356910, at *3 (D. Me. Jan. 31, 2024) (noting that "[t]he ALJ explained that she 'compared' [the] opinion against the evidence and found it lacking, which indicates clearly enough—even if she did not explicitly use the word 'consistency'—that she found the opinion inconsistent with the evidence").  Here, the ALJ discussed the results of Kaknes's various physical examinations, concluding they "generally show full motor strength throughout with no evidence of significant ambulatory dysfunction or neurological deficits apart from mild weakness with bilateral thumb abduction."  R. 101; see R. 101-03.  The ALJ then compared those results to PT Beck's opined limitations, noting why the opinion and the record as a whole were inconsistent (i.e., "physical exams consistently show few resulting functional deficits" and Kaknes "ambulates normally with grossly and consistently intact neurological function") and that there was "little evidence of abnormalities that would support a lifting restriction to 10 pounds."  R. 104.  Furthermore, while Kaknes asserts that "PT Beck's

opinion is arguably bolstered by its consistency with the opinions of Dr. Mitra and Dr. Hom," D. 14 at 10, "an ALJ isn't required to give more weight to a medical opinion simply because it is consistent with another opinion: 'two flawed opinions do not equal a good one.'" Mohns v. Kijakazi, No. 22-cv-82-JDP, 2023 WL 1433039, at *3 (W.D. Wis. Jan. 31, 2023) (quoting Cassens v. Saul, No. 19-cv-912-JDP, 2020 WL 3316094, at *3 (W.D. Wis. June 18, 2020)). For the foregoing reasons, the Court concludes the ALJ adequately discussed the consistency of PT Beck's opinion.

b) The ALJ's evaluation of Shimontini Mitra, M.D.'s opinion

Dr. Mitra opined that Kaknes cannot sit at a computer for more than twenty-five minutes, has an inability to turn his head in any direction, must get up and move around frequently and has neck and shoulder problems lifting a carton of milk. R. 3017, 3085. In concluding Dr. Mitra's opinion was "not persuasive," the ALJ described these opined limitations as "not supported by objective findings and inconsistent with the treatment record." R. 105. Kaknes disputes this conclusion, arguing there is evidence that refutes it, D. 14 at 10, and that the ALJ failed to "provide any explanation as to how [that] evidence would fail to support or lend consistency to the opined limitations in *sitting*," id. at 11 (emphasis in original).

As to supportability, the ALJ stated "Dr. Mitra's opinion appears largely, if not entirely, based on claimant's subjective reports rather than objective mental findings." R. 105. The record contains only a single-page progress note from Dr. Mitra, where a physical examination documented findings only as to Kaknes's skin and mood. R. 3017, 3085. The ALJ, accordingly, acknowledged Kaknes's complaints regarding neck pain, but explicitly noted "there is no objective indication that [Kaknes] is unable to turn their head in any direction" and "no objective support for severe physical limitations." R. 105. An ALJ is not required to "expressly address each of the

factors provided in [the statute]" when discussing the weight afforded to the opinion of a treating source, McNelley v. Colvin, No. 15-cv-1871, 2016 WL 2941714, at *2 (1st Cir. Apr. 28, 2016), and it is appropriate for ALJs to find medical opinions based on a claimant's subjective reports less persuasive, see Bartlett v. Saul, No. 19-cv-11767-ADB, 2020 WL 5803156, at *6 (D. Mass. Sept. 29, 2020).  The Court, therefore, concludes that the ALJ adequately discussed the supportability of Dr. Mitra's opinion.

As to consistency, Kaknes references the records of several medical sources, arguing that Dr. Mitra's opinion is consistent with these sources.  D. 14 at 10-11.  As noted above, the existence of objective findings in the record that are consistent with Dr. Mitra's opinion does not indicate that Dr. Mitra's opinion itself was consistent with the record as a whole.  See Applebee v. Berryhill, No. 17-cv-00003-NT, 2017 WL 6523138, at *9 (D. Me. Dec. 20, 2017), Report and Recommendation adopted, No. 14-cv-003-NT, 2018 WL 1548684, at *1 (D. Me. Mar. 29, 2018), aff'd, 744 Fed. Appx 6 (1st Cir. Nov. 30, 2018).  Even a "minimal" discussion of the consistency of a medical opinion is sufficient to satisfy the statutory requirements.  See Perrino, 2023 WL 2743370, at *8.  Here, the ALJ provided a summary of the record, then compared the record as a whole to Dr. Mitra's opined limitations, noting for example that "physical exams show few abnormalities in [his] neck . . . there is no objective indication that [Kaknes] is unable to turn [his] head in any direction" and that Dr. Mitra's opinion was "not supported by objective finding and inconsistent with the treatment record."  R. 105.  Accordingly, the Court concludes that the ALJ adequately discussed the consistency of Dr. Mitra's opinion.

c)  The ALJ's evaluation of Elaine Hom, M.D.'s opinion

Dr. Hom opined that Kaknes could perform work with four hours of total standing/walking per day, occasional postural limitations, and frequent handling bilaterally.  R. 73-74, 77.  The ALJ

found Dr. Hom's opinion "largely persuasive," finding only the four-hour standing limitation "not persuasive." R. 105. In concluding this standing limitation was "not persuasive," the ALJ stated that Kaknes "consistently ambulates with a normal gait and exhibits full motor strength in his lower extremities with no indication of significant ambulatory or standing deficits." Id. Kaknes argues "the ALJ's rejection of Dr. Hom's opinion suffers from the same errors" as those committed in evaluating PT Beck and Dr. Mitra's opinions. D. 14 at 11.

In discussing the supportability of Dr. Hom's opinion, it appears that the ALJ addressed the supportability and consistency factors together, noting for example that "the medical record does not support [the standing/walking] limitation . . . [Kaknes] consistently ambulates with a normal gait and exhibits full motor strength in his lower extremities with no indication of significant ambulatory or standing defects." R. 105. Where, as here, the ALJ conflates these factors and uses "the terminology of supportability to discuss the consistency" of the opinion with the evidentiary record, minimal discussion of supportability is nonetheless sufficient. Richardson v. Saul, 565 F. Supp. 3d 154, 168-69 (D.N.H. 2021) (emphasis in original). Accordingly, the Court concludes that the ALJ adequately discussed the supportability of Dr. Hom's opinion.

As to consistency, Kaknes references the records of several medical sources, arguing that Dr. Hom's opinion is consistent with these sources. D. 14 at 11. Again, this Court must review the ALJ's decision as a whole. Rodriguez, 647 F.2d at 222. It is a "needless formality to have the ALJ repeat substantially similar factual analyses" at multiple points of the decision. Mitchell v. Kijakazi, No. 21-cv-40085-TSH, 2022 WL 17658117, at *7 (D. Mass. Aug. 19, 2022) (quoting Furey v. Saul, 501 F. Supp. 3d 29, 52 (D. Mass. 2020)). Even so, here, the ALJ repeated this analysis. D. 105. Here too, the ALJ compared Dr. Hom's opined four-hour standing limitation to the record evidence stating, "the medical record does not support [this] limitation . . . [t]he

claimant consistently ambulates with a normal gait and exhibits full motor strength in his lower extremities with no indication of significant ambulatory or standing defects." Id.  The Court, therefore, concludes that the ALJ adequately discussed the consistency of Dr. Hom's opinion.

### 2.  *The ALJ's Characterization of the Record*

Here, Kaknes contends that the ALJ mischaracterized the record in multiple respects. D. 14 at 9-11.  Specifically, Kaknes asserts that the ALJ "either ignored or was unaware of the facts" that contradicted his characterizations of the treatment record and Dr. Hom's opinion.  Id.

### a)  The ALJ's characterization of the treatment record

Kaknes argues "the record refutes" the ALJ's characterization of Dr. Mitra's opinion as having "no objective support" for its opined limitations.  Id. at 10.  The ALJ, here, determined Kaknes's reports of the intensity, persistence and limiting effects of his pain were "not entirely consistent with the medical evidence and other evidence in the record," R. 100-01, and inferred from the record that Dr. Mitra's opinion "appeared" to be "largely, if not entirely," based on Kaknes's reports of pain, R. 105.  In doing so, the ALJ properly used "his responsibility to . . . decide issues of credibility and resolve conflicts of evidence." Cherrl N. v. Saul, No. 19-cv-00274-JDL, 2020 WL 6130745, at *6 (D. Me. Oct. 19, 2020) (quoting Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991)).  Indeed, a review for substantial evidence does not call for the Court to "decide the facts anew [or] make credibility determinations." Lynn v. Comm'r, 791 Fed. Appx. 888, 888-89 (11th Cir. 2020).

In the instant case, the ALJ referred to medical records from February 2019 to December 2022 that showed a lack of increase in adverse symptoms affecting or otherwise unremarkable findings as to Kaknes's range of motion in his extremities and neck, motor coordination, gait, lifting capacity, strength, muscle bulk, tone, sensation and tremors.  R. 100-06.  Indeed, despite Kaknes showing sustained improvements in his symptoms during physical therapy, R. 647, 651,

655, 659, 663, 665, 671, 675, 682, 689, 693, 697, 701, 1701-02, 1704, Kaknes deferred or otherwise chose to not attend physical therapy, reportedly due to a lack of time for the sessions. R. 2516.  As noted, the Court is entitled to recognize the ALJ's inference that Kaknes "would have secured more treatment had his pain been as intense as alleged," and thus, here, conclude that Dr. Mitra's opinion was unpersuasive because it appeared to be largely based on Kaknes's reports of pain.  See Cherrl N., 2020 WL 6130745, at *6; Bowens, 2025 WL 1489987, at *3.  Reviewing this evidence as a whole, the Court, therefore, concludes that there is substantial evidence to support the ALJ's characterization that Dr. Mitra's assessment had "no objective support" for its opined limitations..

Likewise, Kaknes argues the record does not support the ALJ's conclusion that he "always ambulates normally and retains full strength" or that he "consistently show[s] few deficits" during physical examinations.  D. 14 at 9 (internal quotation marks omitted).  Yet, Kaknes perhaps overstates the ALJ's conclusions, which did not indicate that Kaknes "always ambulates normally," id., but, instead, states that he "consistently ambulates with a normal gait," R. 105 (emphasis added).  Although it is true that the ALJ "may not ignore evidence because it is favorable to a claimant," Mason v. Kijakazi, No. 22-cv-10188-FDS, 2023 WL 3158929, at *9 (D. Mass. Apr. 28, 2023), the mere fact that Kaknes can "point to evidence of record supporting a different conclusion does not, in itself, warrant remand."  Malaney v. Berryhill, No. 16-cv-00404-GZS, 2017 WL 2537226, at *2 (D. Me. June 11, 2017), Report and Recommendation adopted, 2017 WL 2963371, at *1 (D. Me. July 11, 2017), aff'd, No. 17-cv-1889, 2019 WL 2222474, at *1 (1st Cir. May 15, 2019).

As noted above, there is sufficient evidentiary support for the ALJ's contention that Kaknes consistently showed few deficits during physical examinations.  See, e.g., R. 437, 705, 709, 1066,

1083, 1591, 1935, 1937, 2043, 2072, 2074-75, 2307, 2519, 2685, 2719, 2945, 2968-69, 3026. Kaknes's attempt to undermine the ALJ's conclusion that physical examination findings were largely unremarkable, see R. 100-06, solely by emphasizing excerpts of evidence that might support a different conclusion is unavailing.  See D. 14 at 3-5, 8-11; Kaitlynn H. v. O'Malley, No. 23-cv-00429-SDN, 2024 WL 4969980, at *2-3 (D. Me. Dec. 4, 2024) (concluding that an ALJ's characterization that "mental status examinations demonstrate[d] largely unremarkable findings," was supported by substantial evidence, despite "excerpts [of] evidence that might support a different conclusion"), Report and Recommendation adopted, 2025 WL 787428, *1 (D. Me. Mar. 12, 2025).  For the foregoing reasons, the Court concludes there is substantial evidence to support the ALJ's characterization of Kaknes's physical examinations.

### b)  The ALJ's characterization of Dr. Hom's evaluation

Kaknes argues "the ALJ incorrectly claimed that Dr. Hom opined" that "[Kaknes] is capable of light work with additional postural and manipulative restriction."  D. 14 at 11.  Kaknes references disability examiner, Josephine McKenzie's determination that Dr. Hom's opinion "equated to a maximum RFC for sedentary work," and thus, argues the record does not support the ALJ's conclusion.  Id.  The Commissioner relies upon the ALJ's authority to consider, but not adopt, state agency doctors' opinions, arguing that "Dr. Hom's findings were consistent with light work except for the standing/walking limitation."  D. 20 at 18.

First, the Court notes that a four-hour standing/walking limitation does not necessitate finding an RFC for sedentary work. See Saeed v. Berryhill, No. 16-cv-11928-ADB, 2018 WL 1243953, at *11 (D. Mass. Mar. 9, 2018) (noting that "[t]his Court does not hold that a two-hour standing/walking limitation necessitates a RFC of sedentary work"); Baillargeon v. Berryhill, 359 F. Supp. 3d 172, 181 (D.N.H. 2019) (noting that "an inability to walk/stand for six hours does not

necessarily preclude a person from having the RFC to perform light work").  Even assuming *arguendo* that there was an error in characterization of Dr. Hom's opinion, R.105, Kaknes still must demonstrate that this error was not harmless.  See, e.g., Angela C. v. Comm'r of Soc. Sec., No. 24-cv-10429-PGL, 2025 WL 889404, at *17 (D. Mass. Mar. 21, 2025) (noting that even if "'superficial' and 'occasional' have distinct meanings in the context of an RFC determination," any error in using each term interchangeably was rendered harmless because the jobs the ALJ determined the plaintiff could perform required only superficial workplace interactions).  Here, even assuming *arguendo* that the ALJ mischaracterized Dr. Hom's opinion, there is no indication that the ALJ's mischaracterization affected his RFC finding.  See Mendez v. Comm'r of Soc. Sec., No 20-cv-14026, 2021 WL 3163765, at *3 (11th Cir. July 27, 2021).  The ALJ also adopted the findings of Dr. Draper, and stated "[a]s with Dr. Hom's opinion, Dr. Draper's opinion [is also] that [Kaknes] is capable of performing a restricted range of light work with additional postural limitations and environmental limitations."  R. 105.  Even assuming that the ALJ incorrectly noted that Dr. Hom's opinion equated to a capacity for a "restricted range of light work," that mischaracterization is ultimately rendered harmless by his adoption of Dr. Draper's findings.  See Deanna v. O'Malley, No. 23-cv-00308-JAW, 2024 WL 2859568, at *4 (D. Me. June 6, 2024), Report and Recommendation adopted, 2024 WL 3236899, at *1 (D. Me. June 27, 2024).  Thus, even if the ALJ erred in his characterization of Dr. Hom's opinion, that error was harmless, and Kaknes is not entitled to reversal or remand on the issue.  See Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).

## V.   Conclusion

Based on the foregoing, Kaknes's motion to reverse, D. 13, is DENIED and the Commissioner's motion to affirm the ALJ's decision, D. 19, is ALLOWED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge